HOURS BY
APPOINTMENT

ORTHOPAEDIC SURGERY
HAND SURGERY

**PERRY A. EAGLE, M.D.**

191 LEADER HEIGHTS ROAD

YORK, PENNSYLVANIA 17402

TELEPHONE (717) 741-4888

FAX (717) 741-2352

September 26, 2002

E. Ralph Godfrey, Esquire
PO Box 6280
Harrisburg PA 17112

RE: John D. Perkey
DOI: 9/15/98

Dear Attorney Godfrey:

The above patient was seen by me at your request for an independent medical evaluation on September 26, 2002 for examination of the cervical spine, lumbar spine, right shoulder and left knee. The history was obtained from the patient. The medical records which you supplied were briefly reviewed.

The patient's history dates back to September 15, 1998. During the course of the patient's employment as a truck driver he was involved in an accident. On the above date the patient was driving his tractor trailer when tires fell from a trailer onto the road causing the patient's tractor trailer to strike the tires and then the embankment. The patient was an unrestrained driver.

Upon impact the patient thinks his left knee struck either the door or the dash and his shoulder struck "something in the cab." The patient kicked the door open to exit the cab after his accident.

The patient was taken to a nearby hospital from the trucking terminal after his accident. In the emergency room the patient complained of knee, shoulder, neck and low back pain. Multiple x-rays were taken. Pain medication was prescribed.

The patient returned home. The patient was living in Ohio at this time. The patient's family doctor followed the patient after his accident for multiple complaints.

Dr. Rychak saw the patient approximately one month after his accident. The patient drove from Ohio to Pennsylvania to see him. His complaints were of neck, low back, right shoulder and left knee problems. The patient was sent for a complete MRI series prior to his first appointment.

The patient was experiencing posterior neck pain on a constant basis. He complained of headaches. He complained of tingling in his ring and little fingers on the right. His tingling began within one week of the accident.

Eagle
DEPOSITION
EXHIBIT
2

Exh 9

E. Ralph Godfrey, Esquire
Page Two
RE: John D. Perkey
DOI: 9/15/98

The patient was referred to Dr. Ostdahl who performed a cervical fusion on the patient in 1999; his surgery helped his symptoms. His numbness and headaches resolved after surgery. Eventually the patient was discharged from Dr. Ostdahl's care approximately one and one-half years ago.

Dr. Beutler recently evaluated the patient for neck complaints. An MRI was ordered earlier this month for his cervical region. The patient states "all of my neck and back symptoms returned." He feels they returned eight months ago. There is no history of trauma at that time. He also developed bilateral hand symptoms again. His hand symptoms wake him at night and have been doing so for the past one and one-half months.

Currently the patient complains of neck pain on a daily basis which is constant for the past eight months. Driving and neck rotation cause neck pain. He complains of numbness in his hands and arms which is intermittent. He "shakes off" his numbness at night. Pre-operatively his symptoms would wake him at night.

The patient currently takes Oxycodone 10 to 20 mgs every 12 hours. He has been taking this medication since his injury in 1998. This medication is prescribed by Dr. Rychak.

Prior to 1998 the patient reports he "blew a disc" in his neck. He underwent surgery for this problem. He had pre-operative numbness and tingling in each hand. Post-operatively he did well. The patient reports he had a total of five surgeries to his neck to date, twice before the 1998 accident and three after the 1998 accident.

The patient developed lower back pain after his 1998 accident. He reports his "back has never been the same." At the time of the accident he was having continued back problems from a previous back problem. Prior to the 1998 accident he had low back surgery by Dr. Litton and four procedures performed on his low back by Dr. Rychak. Prior to the 1998 accident the patient had low back pain but he could continue working with restrictions. After the 1998 his low back began to hurt. After the 1998 accident the patient was treated by Dr. Rychak who felt no specific treatment was in order for his low back. The patient saw Dr. Beutler for a second opinion regarding his low back in September of 2002. An MRI was ordered.

Currently the patient complains of low back pain on a daily basis which is constant. He complains of numbness in both legs since the accident of 1998; this is intermittent. Walking, mowing the grass, driving, all activities cause low back pain. Walking causes tingling in his legs.

The patient is right handed. He developed right shoulder pain within one day of the 1998 accident. Dr. Rychak operated on his left shoulder in 2000. Treatment prior to 2000 of the right shoulder included an MRI and x-rays. His pre-operative symptoms included aching in the right shoulder. He had night symptoms. Any motion of the shoulder causes pain. Post-operatively the right shoulder did well until the past several months. He denies recent injury to his shoulder.

E. Ralph Godfrey, Esquire
Page Three
RE: John D. Perkey
DOI: 9/15/98


The patient currently complains of left shoulder pain most of the time. He has shoulder pain at night and with usage. The patient is unsure if he has had prior right shoulder problems.

The patient was followed for left knee problems after his 1998 accident by Dr. Rychak. He complained of aching pain with weakness in the knee. Arthroscopic surgery was performed by Dr. Rychak on his right knee. A pre-operative MRI was performed. Following right knee surgery his knee did well. He has occasional right knee pain especially with walking. He denies knee swelling. Occasionally his knee buckles and gives way.

The patient thinks he has had prior injections into his left knee. He denies prior right knee problems.

The patient reports he has not worked since his 1998 accident.

Today the patient states his neck is "typical" and his back is terrible. His shoulder and knee are not bad. He did not take his medication today.

Physical examination was performed. At the outset the patient was asked to tell me if any portions of the physical examination which he did or I did caused any discomfort. The patient acknowledged these instructions.

Examination reveals the patient's height to be 72-1/4 inches and his weight to be 254 pounds. The patient appears to be in no acute distress. His gait is somewhat deliberate. He appears to limp at times. When asked if he is limping he states he does not feel he does but his wife at times tells him he does limp. He is able to heel and toe walk without difficulty. He does not limp when heel and toe walking. The patient is able to squat and arise from the squatting position without difficulty.

Examination of the cervical region reveals multiple healed wounds involving the anterior and posterior aspects of the cervical spine. He will rotate the head and neck to 75 degrees in either direction. He will flex to 25 degrees and extend to 30 degrees. He does not volunteer any complaints with range of motion. At my inquiry he states that motion "hurts." With range of motion there is no visible or palpable muscle guarding or spasm. The deep tendon reflexes in the upper extremities are symmetrical. There is no deltoid, biceps, triceps, wrist dorsiflexor or hand intrinsic muscle weakness. The distal sensation is intact. He has no complaints of pain to palpation over the spinous processes of the cervical vertebrae, over the trapezi, over the scapulae or over the interscapular area. Power grip on his dominant right hand averages 120 pounds as does power grip on his left.

Examination of the right shoulder reveals a full range of motion in forward flexion, abduction, internal and external rotation when compared to the opposite side. He offers no complaints of pain with range of motion. No crepitus is palpated during range of motion. There is a healed

E. Ralph Godfrey, Esquire
Page Four
RE: John D. Perkey
DOI: 9/15/98

purged scar anteriorly and laterally, consistent with his history of previous surgery. There is no
tenderness over the acromioclavicular joint or rotator cuff. He complains of tenderness in the
biceps groove. The impingement test causes "a little pain." The patient reports that after
examination of his shoulder his neck "hurts like hell."

Examination of the lumbar spine reveals multiple healed superimposed incisions. The incisions
are well healed and nontender. There is no tenderness to palpation over the spinous processes of
the lumbar vertebrae, sacroiliac joints, sciatic notches or greater trochanters. The patient will flex
the lumbar spine to a measured angle of 70 degrees. I am unable to palpate any spasm or
guarding with range of motion. The patient volunteers that flexion causes discomfort. He is able
to side bend to 15 degrees in either direction, again complaining of discomfort. The deep tendon
reflexes in the lower extremities are symmetrical. On the left there is no toe weakness in flexion
and extension. There is no peroneal, anterior tibial, posterior tibial, hip flexor or quadriceps
weakness. On the right, with testing of each of the aforementioned muscles, a good resistance is
encountered by the examiner and then each muscle totally collapses. The patient then recontracts
the involved muscle. The distal sensation is intact. No toe signs are present. No ankle clonus is
present. The sitting root test is negative bilaterally at 70 degrees. The patient holds each lower
extremity in this position without difficulty when the toe signs are elicited. Classical straight leg
raising causes some mild back discomfort at 70 degrees bilaterally.

Examination of the left knee reveals a full range of motion when compared to the right. Both
knees fully extend and flex to 135 degrees. With flexion and extension no crepitus is present. No
effusion is present. There is no tenderness to deep palpation over the medial or lateral joint lines.
The cruciate and collateral ligaments are stable. There is no pain on compression or subluxation
of the patella. The McMurray test is negative.

X-rays of the left knee taken in my office today including a weight-bearing view reveal the bony
architecture to be within normal limits. There is no evidence of fracture, avulsion injury or
ectopic calcification. The cartilage space is well preserved on the weight-bearing view.

X-rays of the right shoulder taken in my office today reveal absence of the distal portion of the
right clavicle. The glenohumeral joint appears normal. There is no evidence of ectopic
calcification.

X-rays of the cervical spine taken in my office today including flexion and extension lateral
views reveal plate and screw fixation at the C6-7 level. There appears to be a solid fusion at the
C5-6 level. There does not appear to be fusion at the C6-7 level. The remainder of the disc
spaces are relatively well maintained. The foramina are patent on the oblique views. There is no
evidence of subluxation on the flexion and extension views.

X-rays of the lumbar spine taken in my office today including flexion and extension lateral views
reveal pedicle screw fixation to be present at the L4-5 level. There appears to be some bone

E. Ralph Godfrey, Esquire
Page Five
RE: John D. Perkey
DOI: 9/15/98

present bilaterally at this level consistent with previous fusion surgery. The disc spaces are well maintained. There does not appear any motion at the L4-5 or L5-S1 levels on the flexion and extension views. Laminectomy defects are present at these levels.

MRI report dated September 13, 2002 of the cervical spine was concluded as showing spinal fusion apparently at C5-6 and C6-7 with a metallic plate. A shallow central left lateral disc protrusion at C5-6 and C6-7 were described.

Lumbar MRI performed on September 13, 2002 was concluded as showing bilateral pedicle screws at L4 and L5. There was no evidence of spinal canal encroachment or stenosis. A shallow right lateral disc was noted at T11 and T12. No evidence of compression of the conus or cord injury.

MRI report of the right shoulder dated July 30, 1999 was reported as showing post-surgical changes.

The emergency room record dated September 15, 1998 was reviewed. The impression was one of cervical/lumbar sprain/strain. There was no mention of shoulder or knee problems on that record.

X-ray report of the cervical spine from Carlisle Hospital dated June 1, 1999 were reported as showing post-operative changes in the lower cervical spine. A solid fusion was reported at C5-6. A more recent fusion was reported to be present at C6-7.

Further x-rays from Carlisle Hospital dated October 5, 1999 reported the same findings.

X-ray report of October 23, 2000 from Carlisle Hospital reported evidence of previous fusions at C5-6 and C6-7.

The records of Dr. Rychak were reviewed. The first encounter after the subject accident was October 5, 1998. Dr. Rychak reports that had MRIs performed before his evaluation. His notes describe problems with his shoulder. Interestingly enough that evaluation does not document a complete physical evaluation or examination of the cervical region, the lumbar region, his knee or his shoulder.

The records dated October 9, 1998 report diagnoses of acromioclavicular joint arthritis and possible rotator cuff tear and degeneration of the left knee along with the diagnoses of cervical and thoracic disc herniations. It is interesting that no physical examination of the involved portions were performed. The same may be said about the evaluation of November 10, 1998 as well as on multiple continuing examinations.

E. Ralph Godfrey, Esquire
Page Six
RE: John D. Perkey
DOI: 9/15/98

An EMG study performed on June 15, 1998 reported sensory neuropathy of the left foot probably related to chronic lumbar neurogenic processes.

The voluminous records antecedent to the accident in question were reviewed.

It is my opinion that this patient has no objective evidence by documented physical examination or by imaging studies of injury to the right shoulder, cervical spine, lumbar spine or left knee, secondary to the accident of September 15, 1998. The post-accident records of Dr. Rychak are devoid of any physical findings which would link the patient's symptoms to the accident in question. In addition, the imaging studies performed after the accident in question are not supportive of any acute injury. It is also relevant that Dr. Rychak's pre-accident records are replete with continuing symptoms especially regarding his lumbar area. The patient was also noted to have previous problems with his shoulder.

The surgery performed upon his shoulder after the accident in question may have been related to degenerative changes but there is no foundation upon which to speculate that the accident in question necessitated that procedure either by direct cause or aggravation. There is no evidence in the documented medical records that this patient's knee problems were caused or aggravated by the accident in question. Indeed the imaging studies were normal and there were no physical findings which would suggest that the arthroscopic surgery was necessitated by the accident in question.

It should be noted that the patient has had multiple problems with his cervical and lumbar spines in the past and that his continuing symptoms are more compatible with recurrence of his prior problems than with the incident in question. There are no documented imaging studies or objective findings on examination which would dictate any limitations, impairments, restrictions or the need for future treatment as a result of the accident in question.

The patient was cooperative during the conducting of the medical evaluation. Upon my direct questioning he had no complaints concerning the manner or way the independent medical evaluation was conducted.

If I may be of any further help or clarification please do not hesitate to call or write my office.

Sincerely,

Perry A. Eagle, M.D.

PAE/lmp

# PRELIMINARY  REPORT

## of the

# PERKEY  INCIDENT

Prepared By:

Gabriel G. Alexander P.E.

June 19, 2001

Exh B

**Robson Lapina**

# PERKEY INCIDENT REPORT

**ENGINEER'S REPORT**

<u>JUNE 19, 2001</u>

## A.    INTRODUCTION

This wheel separation incident occurred, September 15, 1998, at 6:10 AM, on US 76 in Allegheny County, PA.  The incident involved a 1993 Peterbilt tractor pulling a Kentucky moving van trailer, driven by Daniel Joseph Bemben, and a 1995 International tractor pulling tandem Wabash freight trailers, driven by John D. Perkey.

A trailer wheel end separated from Bemben's vehicle and was struck by Perkey's vehicle.

Bemben's Kentucky trailer was owned and operated by Reliable Carriers, INC.

This investigation was performed to determine the causes or possible causes of the wheel separation.

## B.    INFORMATION AVAILABLE FOR REVIEW

1) Police Accident Report, by the Pennsylvania State Police.

2) Complaint.

3) Maintenance records for the Kentucky trailer.

4) My inspection of the Kentucky trailer including 33 Photos.

## C.    DESCRIPTION OF THE INCIDENT

The Police report states:

*This incident occurred as unit #1 (Bemben) was traveling east in the right lane. Unit #2 (Perkey) was also traveling east in the right lane some distance behind unit #1.  The left front trailer wheels broke off the axle of unit #1, traveled east past unit #1.  As unit #1 pulled to the berm unit #2 Approx. a half-mile past Unit #1 struck the rolling wheels with the right front of unit #2.  This impact broke the*

*right front wheel off unit #2 causing unit #2 to veer off the roadway into an*

1

## Robson Lapina

*oversize berm into a hillside off the berm.  Unit #2 came to rest in the hillside.*

The incident occurred at night and there were no adverse weather conditions reported.


## D.    ANALYSIS

The incident trailer was a Kentucky drop deck moving van (see Photos 1 to 3) Photos 4 and 5 are views of the trailer VIN plate.

The trailer VIN is 1KKVE5229SL101211, S/N 10121, and was manufactured 12-94.

Photo 6 is a view of the trailer left side tires and wheels.  Photo 7 is a close up of the incident wheel position. Photos 8 to 10 are views of the trailer undercarriage and reveal the axle attachment to the trailer suspension.  Photos 11 and 12 are close-ups of the axle date plates.

The incident trailer axles are Dana Spicer model D22 with 5/8" wall tubes. The rated axle capacity for the trailer was 17,000 lbs. each, which is within the 22,500 maximum capacity allowed by Dana for an air ride equipped trailer application.

Motor carriers are required, by the Federal Motor Carrier Safety Regulations to keep vehicles under their control systematically inspected, repaired, and maintained.  The minimal requirements are covered under 49 CFR 396 [1].

My inspection of the incident trailer revealed that there were no signs of disrepair as the trailer was found to be well maintained and in good working order.

My inspection of the maintenance records revealed that, prior to the incident, periodic maintenance on the trailer was performed within the requirements of the Federal Regulations

My inspection of the maintenance record revealed that the last brake work performed on the trailer was on 4/17/98, or about 5 months prior to the incident. Smitty's Truck & Trailer Repair performed this brake work.

The post incident repair records for the trailer state that the front trailer axle was replaced.  Neither the incident wheel end nor the axle was available for inspection. Possible causes of a wheel end failure include improper installation procedures by Smitty's Truck & Trailer, or defective or malfunctioning wheel seals, bearings, lubricant, axles, or a wheel hop induced shock load.


Wheel hop [2,3] is a phenomena that occurs in trailers during braking, going over rough road, or a combination of both.  Load into the tires excites the tire/suspension system at

2

**Robson Lapina**

an harmonic of the resonant frequency.  This excitation causes the unsprung mass (everything below the suspension including tires wheel ends, and axles) to vibrate up and down.  This excitation can amplify vibrations enough to cause the tire to momentarily leave the ground.  When this occurs with the brakes on and locked, skips in the skid marks will be produced.  The vertical loading into the tires can be from a bumpy road or from the interaxle load transfer known to result from braking or a combination of both.

The areas ahead of the toll booths on I-76 contain speed bumps that would normally be encountered while braking, and can cause wheel hop and shock loads. Thus, an axle failure cannot be ruled out  as a cause of the incident.

The police report witness statement identified sparks or fire from under the incident trailer. Neither the cause nor origin of this fire was reported. The maximum operating temperature of typical Timken bearings is about 150-175 $^{\circ}$C[4].  The Nitrile used in typical Chicago Rawhide wheel seals is recommended for a maximum of 121 $^{\circ}$C[5]. Therefore conditions in the failed wheel end, specifically temperature, may have exceeded the operational criteria of the bearing, seal, oil and the axle material itself. Thus, the cause of the sparks or fire reported can not be ruled out as a cause of the incident.

3

**Robson Lapina**

**E.    FINDINGS**

Within a reasonable degree of engineering certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. The cause of the failed wheel end or axle could have been caused by improper installation by Smitty's Truck & Trailer or a design defect or malfunctioning axle, wheel bearing, seal, lubricant. Further, the cause could have been from a wheel hop induced shock load to the axle.
2. Based on my review of the records, the wheel separation was out of the control of Bemben or Reliable Carriers.
3. Bemben and Reliable Carriers properly maintained the incident trailer in accordance with the federal regulations.
4. There is no evidence of any action by Bemben or Reliable Carriers that was improper in a manner that caused this incident.



Gabriel G. Alexander P.E.

4

REFERENCES

1) US DOT Federal Motor Carrier Safety Regulations (FMCSR) 49 CFR Parts 382-399.

2) Mechanics of heavy-duty trucks and truck combinations, UMTRI, Engineering
   Summer Conferences July 10-14, 1989.

3) Current Trends in Truck Suspensions, SAE SP-475, November 1980.

4) Bearing Fundamentals, Timken Co.

5) Seal Handbook, Catalog 457010, Chicago Rawhide, 1999.

5

**Robson Lapina**



**Photo 1**



**Photo 2**



**Photo 3**



**Photo 4**



**Photo 5**



**Photo 6**



**Photo 7**



**Photo 8**



**Photo 9**



**Photo 10**



**Photo 11**



**Photo 12**

# Robson Lapina

Forensic Engineers, Architects, Scientists & Fire Investigators

404 COMMERCE PARK DRIVE
CRANBERRY TOWNSHIP, PA 16066

PHONE: 724-772-2244
800-813-6735

FAX: 724-772-2256
WWW.ROBSONLAPINA.COM

April 10, 2003


Ralph Godfrey
Godfrey & Courtney, P. C.
P.O. Box 6280
Harrisburg, PA 17112-0280


Re: Perkey v. Reliable Carriers.


Dear Attorney Godfrey:

Subsequent to my report dated 6/21/2001, I have received and reviewed the following materials:

1) Expert report of David W. Kassekert, PE;
2) Deposition transcript of Daniel Bemben;
3) Deposition transcript of Fred Purol;
4) Scene photographs.

After reviewing the newly made available information, the opinions expressed in my 6/21/2001 report remain unchanged.

With regard to Bemben's deposition I offer the following observations. First is that Bemben testified that he inspected the subject wheel end on the morning of the incident and found no abnormal condition. Secondly Bemben testified that had he discovered a problem he would have remedied the problem. Thirdly, Bemben testified that he had a flashlight and utilized it specifically for the purpose of determining the lubrication level, which he did. Finally, Bemben testified that not only did he understand the importance of lubricant for the subject wheel end he also understood that if lubricant was missing he would need to determine why and remedy the source of the leak.

Therefore Bemben demonstrated that he understood proper inspection and maintenance procedures and his role as a professional driver.  Further, Bemben testimony is consistent with a properly maintained trailer as I found at my inspection. Finally, as stated in the findings of my 6/19/2001 report:

There is no evidence of any action by Bemben or Reliable Carriers that was improper in a manner that caused this incident.

*Local offices throughout Indiana, Kentucky, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Virginia and West Virginia*

# Robson Lapina

Forensic Engineers, Architects, Scientists & Fire Investigators

With regard to the expert report of Kassekert I offer the following. Kassekert utilized statements of others with regard to what was seen and the post incident repair record, yet ignores the deposition testimony of Bemben with regard to what he saw at his pretrip inspection on the date of the incident. A deposition to which Kassekert attended

Kassekert offers no evidence that maintenance and/or inspection was a factor in this incident. Further, Kassekert fails to present what maintenance and or inspection steps procedures or actions specifically caused this incident. Finally, Kassekert does not identify what Reliable and/or Bemben should have done to prevent this incident which is particularly troublesome considering the fact that Kassekert, who has not inspected the trailer and or the failed components, ignored Bemben's testimony with regard to his inspection of the trailer prior to the incident and yet opined that it was improper inspection and/or maintenance that caused the failure.

Kassekert provided no scientific evidence/methodology or generally accepted literature or analysis to support his opinion that improper maintenance and/or inspection caused this incident. Further, Kassekert offers evidence as to how a defective bearing, wheel seal, lubricant, hubcap, or a combination of those factors was eliminated as a cause of the incident.

Again, as stated in the findings of my 6/19/2001 report:

> There is no evidence of any action by Bemben or Reliable Carriers that was improper in a manner that caused this incident.

If you have any question, feel free to call.

Sincerely,



Gabriel G. Alexander P.E.

2418 NORTH SECOND STREET
HARRISBURG, PENNSYLVANIA 17110
TELEPHONE (717) 233-7779
FAX (717) 233-0350

## *Anderson Associates Psychology & Consulting*

PAUL A. ANDERSON, D.Ed.

# VOCATIONAL EVALUATION REPORT

**To:**   **E. Ralph Godfrey, Esquire**
**Law Offices of Godfrey & Courtney, PC**
**2215 Forest Hills Drive, Suite 36**
**PO Box 6280**
**Harrisburg, PA 17112-0280**
**Phone: (717) 540-3900**
**Fax:   (717) 540-3555**

**Re:**   **John D. Perkey**
**328 Pine Grove Road**
**Gardners, PA 17324**
**Phone:   (717) 486-5080**

**DOB:   10/18/48**
**AGE:   54**
**SSN:   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**

**April 4, 2003**

9 x4 c

# TABLE OF CONTENTS

Page

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Review of Records and Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Specific Tests Administered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

Job at Time of Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3

Significant Vocational and Medical Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Diagnostic Interview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6

Educational Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

Vocational Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Preinjury/Postinjury Career Aspirations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Specific Tests Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

Definition of Strength Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Vocational Implications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-12

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Vocational Evaluation Report
Re:  John D. Perkey
April 4, 2003

## INTRODUCTION

A vocational evaluation of John D. Perkey was conducted in my offices on the date of April 3, 2003.  The assessment consisted of a records review, a diagnostic interview and the administration of vocational tests, which included measures of intellectual performance, vocational interest and aptitude, educational achievement, manual dexterity and perceived physical functioning. Mr. Perkey  was involved in an accident.   The purpose of the vocational assessment, which was explained to Mr. Perkey and he expressed understanding, was to evaluate Mr. Perkey's vocational potential and any lessening of his ability to work as a result of that accident.

## REVIEW OF RECORDS AND REPORTS FROM:

1.    Perry Eagle, MD, York, PA (Independent Medical Examination)
2.    WorkMed, Youngstown, Ohio
3.    HealthSouth, Carlisle, PA (Functional Capacity Evaluation dated 5/8/97)
4.    J. Joseph Danyo, MD, FACS, York, PA (Independent Medical Examination)
5.    Thomas E. Fink, MA, Harrisburg, PA
6.    Bruce Goodman, MD, Harrisburg, PA (Independent Medical Examination)
7.    John M. Hume, MD, JD, Harrisburg, PA (Independent Medical Examination)
8.    Physiotherapy Associates, Harrisburg, PA (Functional Capacity Evaluation dated 2/24/00)
9.    Allen J. Mira, MD
10.   John S. Rychak, MD, Camp Hill, PA
11.   Jason J. Litton, MD
12.   Roger Ostdahl, MD, Camp Hill, PA
13.   David W. Bryant, MD
14.   Rodney Hough, MD, Carlisle, PA
15.   David C. Baker, MD, FACS, Carlisle, PA
16.   Deposition of John Perkey, 4/17/02 and 7/3/02
17.   Extensive diagnostic, treatment and physical therapy records
18.   Social Security Administration lifetime earnings report

## SPECIFIC TESTS ADMINISTERED

.    Jastak Wide Range Achievement Test-Revision 3
.    U.S. Department of Labor Occupational Check List
.    Purdue Pegboard Test
.    Minnesota Clerical Test
.    Beck Depression Inventory

## BACKGROUND

The following was reported by Mr. Perkey during his interview with me on April 3, 2003.

Vocational Evaluation Report
Re:  John D. Perkey
April 4, 2003                                                                                                          Page 2

On September 15, 1998, Mr. Perkey was injured in a motor vehicle accident.  On that date, while in the employ of Arkansas Best Freight, Inc. (ABF), Mr. Perkey was operating a tractor-trailer eastbound on Interstate 76, the Pennsylvania Turnpike, when his vehicle struck two tires and a brake drum from another tractor-trailer.  Mr. Perkey's truck then hit an embankment.  Mr. Perkey stated that he sustained injuries as a result of this collision.

## MEDICAL DIAGNOSES AND TREATMENT HISTORY:

1.  Diagnosis of the hospital was cervical sprain/strain.  Mr. Perkey remained in the Lima, Ohio area and was treated conservatively by a physician in that area.

2.  With belief that his symptoms were growing worse, Mr. Perkey transferred his treatment to the Harrisburg, PA area to Dr. John Rychak.  He subsequently sought the services of Dr. Roger Ostdahl, a specialist in neurology.  Both of these physicians had treated Mr. Perkey previously.

3.  Mr. Perkey stated that the initial discomfort he experienced in his neck following the accident spread to his shoulders and arms, his lower back and his left knee.  He stated, however, that he had a history of upper back, lower back, shoulder and knee problems prior to the accident of September 15, 1998.

4.  Specifically, Mr. Perkey underwent two neck surgeries, five low-back surgeries, a left shoulder operation, and a knee arthroscopy, all of which occurred prior to the accident of September 15, 1998.

5.  Surgical procedures that occurred subsequent to the accident included a cervical disc fusion with instrumentation in 1999, an operation to remove a screw, and a procedure to address a stenotic condition in Mr. Perkey's neck.  He also underwent a right shoulder surgery under the care of Dr. Rychak in either late 1998 or early 1999.

6.  Physical therapy was part of Mr. Perkey's treatment regime both before and after the surgeries that followed the accident of September 15, 1998.

7.  Mr. Perkey noted that during his years as a truck driver, he has been involved in other accidents, and his spine took a battering from the truck seats "that fail to give in an accident" and vibration. Treatment that occurred under the care of his doctors, Rychak and Ostdahl, were both of his neck surgeries prior to the September 15, 1998 accident and all five of his previous low-back surgeries.  He stated that both of his physicians advised against continuing in the truck driving field in association with limitations following the previous accidents.

8.  Mr. Perkey stated that his previous injuries were due to two previous accidents while driving a tractor-trailer.  One occurred on June 9, 1982, when his trailer was struck from behind.  The second led to Mr. Perkey jack-knifing his tractor-trailer when a car

Vocational Evaluation Report
Re:  John D. Perkey
April 4, 2003
Page 3

entered an interstate in New Jersey from a ramp. He was treated by Dr. Hough at that time.

9.  With regard to current treatment, Mr. Perkey was ordered to report to an orthopedic clinic in Towson, Maryland associated with Johns Hopkins University and under the direction of Dr. Paul McCaffey regarding possible surgery.  However, there was debate as to whether pre-existing hardware implanted in his lower back should be removed.  Ultimately, he was advised against any further spinal surgery.

10.  At the time of this evaluation, Mr. Perkey stated that his low-back discomfort has increased since the date of the accident of September 15, 1998.  In addition, he reports more painful symptoms in his neck and upper torso, which had quieted at the time of his September 15, 1998 accident.  Moreover, he stated that his right shoulder had recovered from his post-September 15, 1998 accident surgery, but he has recently been diagnosed with a right rotator cuff tear.

## JOB AT TIME OF INJURY

At the time of injury on September 15, 1998, Mr. Perkey was employed by ABF, Inc.  He had been in this position for about 21 years, initially with Carolina Freight, which was later acquired by ABF.  During this time, Mr. Perkey stated that he missed work in association with the previously-noted medical problems and two accidents.  He stated that he was off work for about 18 months during one such occurrence and for about a year in association with the other.  His last day of work was September 15, 1998, the date of the most recent accident.  In addition to driving duties, his truck driver position involved infrequent loading and unloading of trucks.

In addition to his salary, Mr. Perkey received union benefits including health care, paid vacation days, paid holidays and contributions to a retirement plan.  He was a member of the Teamsters Union AFL-CIO Local 776 as well as a Youngstown, Ohio-based union. Following the accident, Mr. Perkey has not sought alternative employment.

## SIGNIFICANT VOCATIONAL AND MEDICAL FINDINGS

1.  In an office note dated January 18, 1983, Mr. Perkey's family physician at the time, Dr. Allan Mira, noted, "This is a 33-year-old while male who was entirely well without the following complaints until he was involved in a multiple truck accident June 9, 1982 . . . subsequently has complained of severe headaches and neck symptoms . . . He has been using TENS for his headaches and neck discomfort."

2.  In an office note dated January 27, 1983, Dr. Mira noted, "Mr. Perkey called today relating that he did go back to work and his first trip was to Albany, New York. He said he had a bad headache the entire trip, he wore the TENS with no relief.  Upon returning home, he called Dr. Ostdahl, who told him that he may have to quit driving

Vocational Evaluation Report
Re:  John D. Perkey
April 4, 2003                                                                                                           Page 4

truck."

3.   In an office note dated February 22, 1983, Dr. Roger Ostdahl noted, "I have a note
     here from that date that I had a long discussion with him.  I thought it would probably
     be appropriate to discontinue his truck driving for the present time due to his
     continued difficulties" (neck discomfort and headaches associated with on-going
     trucking).  Dr. Ostdahl also recommended limiting his work to 8 hours per day, instead
     of 10 hours, and a guarded prognosis was noted.

4.   A report by Dr. Bruce Goodman dated April 6, 1999 provides a detailed history of Mr.
     Perkey's medical problems prior to the accident of September 15, 1998.  The report
     states:

          "This man was seen by an orthopedic surgeon in July of that year and
          referred for neurosurgical consultation.  This was a case in which Mr.
          Perkey had been involved in a motor vehicular accident while driving a
          truck.  He apparently developed suboccipital discomfort as well as pain
          in the upper neck and had a feeling of lightheadedness.

          His neurosurgical evaluation was compatible with a mild cervical
          musculoligamentous strain as well as a possible mild concussion.  He
          was then followed by an attending neurosurgeon in deference to the
          aforementioned and was treated in a conservative fashion.

          In January 1983, he was again seen by his attending neurosurgeon
          because of a recurrence of severe neck discomfort and headaches.
          There were no neurological deficits identified and it was suggested it
          would be appropriate for Mr. Perkey to avoid long distance truck driving
          . . .

          In 1985, he jack-knifed his truck trying to avoid a car and sustained
          increased discomfort in his neck area and describes some radicular
          symptomatology involving the right upper extremity.  It was felt he had
          an aggravation of his previously existing musculoligamentous strain.

          He was treated with some modalities of physical therapy for a period of
          time and as of May 20, 1985, was felt to be totally disabled from
          returning to any type of truck driving activities.  It was suggested,
          however, that he was employable in other circumstances with avoidance
          of truck driving . . .

          Considering the fact that this man has had two cervical operative
          procedures as well as five operative procedures to the low back and two
          to the shoulder, I could certainly not accept his multiple neck and low

back complaints as being directly and causally related to the specific incident of September 1998.  He might have aggravated these areas, however his discomfort at this time is based upon pre-existing factors as mentioned above."

5.  In a June 6, 1995 report from Dr. Keith Kuhlengel, he reports, "At this point in time, based on the pateint's radiographic studies and complaints, I do not feel that he is capable of persistent heavy lifting or of driving a tractor-trailer without significant discomfort."

6.  A functional capacity evaluation dated May 8, 1997 by HealthSouth, Carlisle, PA noted, "Driving over the long distance is questionable since his sitting tolerance was measured at 31 minutes with positional changes requested for low tolerance and comfort.

Mr. Perkey perceived that he would be capable of returning to work in an over-the-road driving position; however, is not certain of his ability to tolerate the long duration of sitting and the vibration/impact components which related to the road conditions and truck bouncing/jarring.

It is felt that Mr. Perkey's current physical capacity and decreased work conditioning would impair his ability to perform the frequent lifting and/or endurance which would correspond with the pick up and delivery driver job position.  It is uncertain whether he would be capable of tolerating the over-the-road line haul driving position due to his decrease in sitting tolerance . . ."

7.  In a report dated March 9, 1999, Dr. J. Joseph Danyo wrote, "What does this mean insofar as employment?  The right shoulder has not healed sufficiently to allow for a return to the previous line haul driving at this point.  I expect that will be about another two months before that is possible.   He is not disabled from all work, and the physical evaluation for alternate work is listed.  I expect he would be able to do his previous duties based upon this new accident in mid-May.  The bottom line is that the shoulder can use about two more months of rehabilitation and after that, I expect he will be back to where he was before this accident.  That means he would be able to resume the prior job as a line haul driver."

8.  In a Functional Capacity Evaluation performed February 24, 2000 by Physiotherapy Associates, it was noted that "it is found that John can work eight hours per day at the light-medium physical demand level.  No frequent lifts to or from floor level should be required.  All weighted activities were terminated by back or left leg should be required.  All

Vocational Evaluation Report
Re:   John D. Perkey
April 4, 2003

weighted activities were terminated by back or left leg pain reports. Neck pain reports were noted in Above Shoulders level lifting but were not specifically a focus in other activities except in Cervical Mobility."

9.      In a letter dated February 25, 2003, Dr. John Rychak noted, "Following Mr. Perkey's September 1998 accident, he was unable to continue working as an over-the-road truck driver.    This is confirmed unequivocally by an FCE that had been subsequently performed.  At the time that I had the FCE performed, I was making an independent assessment whether or not John could return to gainful employment. It is my feeling that it is probably a combination of factors, i.e., from his ongoing condition and the fact that he did require more surgery to the cervical spine, as well as his ongoing symptoms and an aggravation as a result of his motor vehicle accident that have prevented him from returning to gainful employment.   There is no way that I can state unequivocally that all of his problem is directly related to the accident. It is a simple situation.  He had pre-existing conditions in many different areas.   In fact, he has even had pre-existing problems with his left shoulder as well as his right shoulder.  So all of these areas contribute to his present condition . . .

My feeling is that we are dealing with increasing symptomatology and symptoms that happened."

10.     According to Mr. Perkey's Social Security Administration lifetime earnings report, his wages were as follows:

| Year | Wages | Year | Wages | Year | Wages | Year | Wages |
|------|-------|------|-------|------|-------|------|-------|
| 1964 | $712 | 1973 | $8,094 | 1982 | $17,118 | 1991 | $27,546 |
| 1965 | $571 | 1974 | $7,056 | 1983 | $21,374 | 1992 | $26,419 |
| 1966 | $1,168 | 1975 | $958 | 1984 | $29,138 | 1993 | $19,138 |
| 1967 | $1,417 | 1976 | $3,145 | 1985 | $6,489 | 1994 | $18,789 |
| 1968 | $1,060 | 1977 | $7,298 | 1986 | $20,766 | 1995 | $4,421 |
| 1969 | $2,380 | 1978 | $16,868 | 1987 | $38,628 | 1996 | $0 |
| 1970 | $2,849 | 1979 | $22,900 | 1988 | $38,360 | 1997 | $29,267 |
| 1971 | $3,504 | 1980 | $24,604 | 1989 | $29,037 | 1998 | $51,903* |

Vocational Evaluation Report
Re:  John D. Perkey
April 4, 2003                                                                                                    Page 7

| 1972 | $7,039 | 1981 | $29,700 | 1990 | $30,197 | 1999 | $9,264* |

*Includes the provision of collateral resources beyond such as Social Security Disability and Workers Compensation payments, the handling of which must be made in a legal arena under collateral resource provision.

## DIAGNOSTIC INTERVIEW

Mr. Perkey lives in the community of Gardners, Cumberland County, Pennsylvania, with his wife, their 3-year-old child and his father-in-law.  He has six other children, all of whom are emancipated from the home.

He made a neat appearance.  He was wearing glasses and was neatly and casually attired, appropriate for the evaluation.  He appeared to be reasonably comfortable during the three- to four-hour evaluation.

Mr. Perkey's senses of vision, hearing, smell, taste, balance and touch were reported to be normal.  With respect to the sense of touch, he stated that he experiences some numbness and tingling that radiates down his right side once or twice a week.  Bowel and bladder functions were reported to be normal.

Mr. Perkey is right hand dominant.  Use of upper extremities were reported as normal with respect to his arms, fingers and hands, bilaterally.  With respect to the use of lower extremities, he stated that walking and sitting aggravates his pain symptoms.  Gait on the date of the evaluation was observed to be normal.  He stated that when his symptoms become exacerbated, his gait becomes more guarded.  He is not using accident-related artificial appliances, bracing or nerve-stimulating units.

With respect to medications, Mr. Perkey stated that he uses Vicoprofen for pain on an as-needed basis.  He stated that he takes the medication about twice daily.  He also uses Zoloft for depression.  He stated that he has taken this for a number of years.  It was prescribed by his family physician, Dr. Rodney Hough.

Appetite was reported as "good."  Sleep was reported as problematic since the 1998 accident.  Mr. Perkey's mental status was reported as "fine."  He stated that use of Zoloft has helped, and he no longer has significant problems with depression.  Medical records indicate that he was assessed psychologically and psychiatrically in association with an accident in 1982.  This included details of pain management strategies.

## EDUCATIONAL BACKGROUND

Mr. Perkey graduated from Greensburg-Salem High School, located in Greensburg, PA in 1968.  He stated that he was a below-average student.  In the mid-1970's, he received training to drive a tractor-trailer.  he has had no other schooling.

Vocational Evaluation Report
Re:   John D. Perkey
April 4, 2003                                                                                           Page 8

## VOCATIONAL BACKGROUND

Following graduation from high school, Mr. Perkey joined the US Air Force, where he remained for about two years.  He was honorably discharged.  While in the service, he performed work as a truck mechanic.

After his military service, Mr. Perkey stated that he took a number of jobs to help determine life goals, finally deciding upon a career as a truck driver.  His first employer in the field was Roy Stone Trucking, where he drove a tractor-trailer for about six months.  He was next employed by Latrobe Construction as a local deliveryman, driving a dump trailer.  Next, Mr. Perkey drove a tri-axle dump truck for Golden Eagle Construction during warm seasons for several years.

Mr. Perkey then worked as a self-employed over-the-road truck driver for two or three years.  He did not do bookkeeping associated with this work, but he was responsible for securing his own loads.  Mr. Perkey subsequently accepted employment with Carolina Freight, which was later obtained by ABF, Inc., as detailed.

## PREINJURY/POSTINJURY CAREER ASPIRATIONS

Prior to his accident of September 15, 1998, Mr. Perkey's career aspiration was to remain an over-the-road truck driver for ABF, Inc.  This was despite medical recommendation to seek alternative employment due to existing spinal conditions prior to the accident of September 15, 1998.  He stated, however, that he resisted the recommendations and secured a release to drive because he was skilled as a truck driver, because he enjoyed the work and because the income was good.

Postinjury, Mr. Perkey's career aspirations are confused.  He stated that he has thought about returning to truck driving because this is his first love.  He stated that were he to receive medical release to do so, he would return to such a position.  The skills he acquired as a truck driving include regulations regarding the safe operation of trucks and the use of CB radios.

Mr. Perkey stated that he is currently 54 years of age and would be eligible for full retirement benefits from the union at age 57, some two and a half years hence.  He stated that he is still a union employee and that his status with the union is secure.  He said the only way the status would change is if he makes a settlement with ABF, which he stated that he does not want to do.  He said he wants to return to work in a position that includes union membership.  he noted that union membership entitles him to not only drive truck but also to qualify for other positions such as dockworker, truck jockey and dispatcher as well as others.  Union dispatching pays in the $17 to $20 per hour range, minimally.

Non-union positions, based upon the results of this evaluation, would include dispatching, chauffeur, local truck driving, low-level supervision at a parking lot or self-serve gas station

or night watchman.  Earnings in these non-union positions would range from $7 to $13 per hour, averaging $11 per hour, or $22,880 annually.

## SPECIFIC TEST RESULTS

The Jastak Wide Range Achievement Test-Revision 3 (WRAT3) was administered because of the range of grades and abilities which it encompasses.  Mr. Perkey received the following scores on this test:

| SKILL AREA | RAW SCORE | STANDARD SCORE | PERCENTILE | GRADE LEVEL |
|---|---|---|---|---|
| Reading | 33 | 65 | 1st | 4th |
| Spelling | 30 | 58 | 0.6th | 3rd |
| Arithmetic | 39 | 79 | 8th | 7th |

Through the administration of the U.S. Department of Labor's Interest Check List, Mr. Perkey's highest levels of vocational interest were found to exist in these areas:

1.   Drive a trailer-truck or bus (highest)
2.   Operate cranes and power shovels to move materials
3.   Serve as guide for hunting and fishing trips
4.   Keep lookout for forest fires

The Purdue Pegboard Test measures dexterity for two types of activity:  one involving movements of the hands, fingers and arms, and the other involving primarily what might be called "fingertips" dexterity.  When compared to norms of industrial applicants, test results indicate that for the right hand, Mr. Perkey's gross manual dexterity is at the 17th percentile, and for the left hand, is at the 20th percentile.  Bimanual coordination is at the 25th percentile, and fine finger dexterity is at the 16th percentile.  These are below average results.

On the Minnesota Clerical Test, Mr. Perkey's performance on the Number Comparison subtest fell at the 15th percentile, indicating below average aptitude for simple, rapidly paced clerical jobs.  The norms of bank clerks were used for comparative purposes.

Mr. Perkey's score of 4 on an administration of the Beck Depression Inventory 2 is not indicative of the presence of significant depression-related symptoms.

Vocational Evaluation Report
Re:   John D. Perkey
April 4, 2003

## DEFINITION OF STRENGTH FACTORS

According to the <u>Dictionary of Occupational Titles</u>, Fourth Edition, Revised, 1991, published by the U.S. Department of Labor, Employment and Training Administration, the following are descriptions of the five terms in which the Strength Factor is expressed:

"<u>Sedentary Work</u> - Exerting up to 10 pounds of force occasionally (Occasionally:  activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently:  activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

<u>Light Work</u> - Exerting up to 20 pounds of force occasionally (Occasionally:  activity or condition exists up to 1/3 of the time), and/or up to 10 pounds of force frequently (Frequently:  activity or condition exists from 1/3 to 2/3 of the time), and/or a negligible amount of force constantly (Constantly:  activity or condition that exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Sedentary Work.  Even though the weight lifted may be only a negligible amount, a job should be rated Light Work:  (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.  NOTE:  The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

<u>Medium Work</u> - Exerting 20 to 50 pounds of force occasionally (Occasionally:  activity or condition exists up to 1/3 of the time), and/or 10 to 25 pounds of force frequently (Frequently:  activity or condition exists from 1/3 to 2/3 of the time), and/or greater than negligible up to 10 pounds of force constantly (Constantly:  activity or condition that exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Light Work.

<u>Heavy Work</u> - Exerting 50 to 100 pounds of force occasionally (Occasionally:  activity or condition exists up to 1/3 of the time), and/or 25 to 50 pounds of force frequently (Frequently:  activity or condition exists from 1/3 to 2/3 of the time), and/or 10 to 20 pounds of force constantly (Constantly:  activity or condition that exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Medium Work.

<u>Very Heavy Work</u> - Exerting in excess of 100 pounds of force occasionally (Occasionally:  activity or condition exists up to 1/3 of the time), and/or in excess of 50 pounds of force frequently (Frequently:  activity or condition exists from 1/3 to 2/3 of the time), and/or in excess of 20 pounds of force constantly (Constantly:  activity or condition that exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Heavy Work."

## VOCATIONAL IMPLICATIONS

1.   Mr. Perkey is a 54-year-old male whose medical history of an array of spinal, cervical, shoulder, arm and knee symptoms extends almost as long as his vocational history as a truck driver.  He began his truck-driving career in the late 1970's.  His extensive medical history relating to problems with driving the vehicles begins in 1982.

2.   Mr. Perkey on several occasions, in fact as early as January 1983, received

Vocational Evaluation Report
Re:  John D. Perkey
April 4, 2003                                                                                          Page 11

recommendations that he seek alternative employment and stop driving trucks.  He
was viewed as totally disabled from such activity in 1985.  He had undergone two
cervical surgeries, five lower-back surgeries, a shoulder procedure and a knee
operation prior to the accident of September 15, 1998.  Additional surgical procedures
occurred after that accident.

3.    Mr. Perkey was awarded disability Social Security benefits, based upon severity and
      permanency, prior to the accident of September 15, 1998.  His return to work had
      lasted about 9 months at the time of this accident.

4.    In releasing Mr. Perkey to return to his work as a line-haul truck driver in March 1999,
      Dr. J. Joseph Danyo noted that Mr. Perkey's condition would return to that which was
      present prior to an accident that occurred at that time.  However, Mr. Perkey had long
      been engaging in truck driving activities despite medical advice against doing so.

5.    Cross-referencing Mr. Perkey's medical history and his Social Security lifetime
      earnings yields evidence that his medical conditions, as they existed beginning in
      1982, were having a degrading effect on his earnings potential long before the
      accident of September 15, 1998.  From 1978 to 1981, Mr. Perkey demonstrated
      steadily increasing earnings, from $16,868 in the former year to $29,700 in the latter.
      Then, in 1982, when he demonstrated health problems were first noted, his earnings
      show a wide disparity.  He earned $17,118 in 1982; $21,374 in 1983; $29,138 in
      1984; but only $6,489 in 1985 after another accident.  In both 1982 and 1985, it was
      recommended that Mr. Perkey seek alternate employment and stop driving trucks.

      Mr. Perkey returned to the field, however, and demonstrated substantial earnings
      potential.  In fact, his best back-to-back earnings years were 1987 and 1988, when
      he earned $38,628 and $38,359 respectively.  After those two years, however, he
      showed a demonstrable and steady decline in his earnings through 1996.  His
      earnings in 1989 were $29,037; in 1991, $27,545; in 1993, $19,138; in 1995, $4,421;
      and in 1996, zero.

      Mr. Perkey demonstrated significant earnings income from 1997 at $29,267 and 1998
      at $51,903.  The latter year, however, included income from collateral resources.  The
      former year does not show re-attainment of previously demonstrated earnings
      potential in the late 1980's in excess of $38,000 annually.

6.    Medical records reviewed in this case recognize Mr. Perkey's pre-existing medical
      conditions.  They note that, at best, the accident of September 15, 1998 caused
      exacerbation of long-existing symptoms.  From a vocational standpoint, Mr. Perkey
      was acting against medical advice and beyond his expected level of vocational
      performance beginning as early as 1983.  Mr. Perkey stated that truck driving is and
      has been his first love, and he is to be admired for continuing in the field despite the
      obvious discomfort it has caused him for decades.  However, from an economic

standpoint, there is no reasonable projection of loss of earnings potential or past loss of earnings from the September 15, 1998 accident alone.   Any such loss consideration would have to take into account two decades of vocational activity beyond the realm of medical tolerance.  As such, it can be stated to a reasonable degree of vocational certainty that Mr. Perkey has, for years, achieved economic levels beyond what could be reasonably expected of an individual with his medical limitations.

7.     Mr. Perkey is still capable of vocational activity, as described earlier, in positions such as dispatcher, chauffeur, local truck driver, low-level supervisor at a facility such as a parking lot or self-service gasoline station, or even in security work.  Some of these positions would fall within the scope of Mr. Perkey's union membership, some would not.  Earnings would not reach the levels demonstrated by Mr. Perkey during his earlier years of truck driving, before repeated injuries and ongoing development of symptoms took their toll.  His present earnings capacity, however, would equal his demonstrated earnings from the early 1990's through the mid-1990's. Any evaluation of Mr. Perkey's earnings potential must look at the overview of his economic achievement rather than at any one particular year in order to be viewed as complete.

**SUMMARY**

Mr. Perkey is a 54-year-old male who has performed remarkably in terms of his vocational achievement and earnings potential given a long-standing and serious level of medical limitation, including several recommendations that he change his line of work.  Because of the extensive medical background, including seven spinal and cervical surgeries prior to the accident of September 15, 1998, there can be no reasonable projection of loss of earnings potential attached solely to that accident.  Moreover, there can be no reasonable projection of loss of earnings potential based solely upon his total income package for the year 1998, which included income from collateral resources and was an aberration with respect to his earnings history.  Alternative vocational endeavor, as recommended as early as 1982, remains open to him, as detailed above, with earnings potential consistent with his earnings during the 1990's.

These opinions are stated to a reasonable degree of vocational certainty.  If you have any questions, please advise.

Sincerely,

Paul A. Anderson, D.Ed., ABVE
Psychologist, Diplomate American Board of Vocational Experts

PAA/lld

SEQY  DTE:04/04/03  AN: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  DOC:204  UNIT:DSA        PG: 001
MEF: QN: 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 NA: J D PERKEY DB: 10/1948 SX: M AK: PERKY

SUMMARY FICA EARNINGS FOR YEARS REQUESTED

| YEAR | EARNINGS | YEAR | EARNINGS | YEAR | EARNINGS | YEAR | EARNINGS |
|------|----------|------|----------|------|----------|------|----------|
| 1964 | 712.02   | 1973 | 8093.74  | 1982 | 17118.46 | 1991 | 27545.77 |
| 1965 | 570.50   | 1974 | 7056.45  | 1983 | 21374.22 | 1992 | 26418.69 |
| 1966 | 1167.52  | 1975 | 958.10   | 1984 | 29137.63 | 1993 | 19137.67 |
| 1967 | 1417.08  | 1976 | 3145.21  | 1985 | 6488.84  | 1994 | 18789.35 |
| 1968 | 1060.42  | 1977 | 7297.50  | 1986 | 20765.96 | 1995 | 4421.02  |
| 1969 | 2379.66  | 1978 | 16867.91 | 1987 | 38628.05 | 1996 | .00      |
| 1970 | 2848.57  | 1979 | 22900.00 | 1988 | 38359.56 | 1997 | 29266.65 |
| 1971 | 3504.35  | 1980 | 24604.40 | 1989 | 29037.01 | 1998 | 51902.83 |
| 1972 | 7039.41  | 1981 | 29700.00 | 1990 | 30196.83 | 1999 | 9263.67  |

REMARKS
CLAIMS ACTIVITY -- SEE MBR

## DEFENDANTS' PROPOSED VOIR DIRE QUESTIONS

1.      Whether any of the panel members know any of the parties, are employed by any of the parties, or have close family members who know or are employed by any of the parties?

2.      Whether any of the panel members know any of the witnesses proposed to testify, either professionally or socially.

3.      Whether any of the panel members know E. Ralph Godfrey, Esquire, counsel for the Defendants, with the law firm of Godfrey & Courtney, P.C., or Marcus McKnight, Esquire, counsel for the Plaintiffs, with the law firm of Irwin, McKnight & Hughes, either professionally or socially?

4.      Whether any of the panel members know anything about the accident involving the parties which occurred on March 19, 1994 at or near 10 Country Drive, Chelsea Village, Leola, Pennsylvania?

5.      The occupation of each panel member and the occupation of those who reside at each panel member's household.

6.      With respect to retired panel members, their occupation prior to retirement.

7.      Whether any of the panel members have ever been involved in any accidents in which they were injured, a description of the accident, whether any litigation followed such accidents and whether the panel member was a plaintiff or defendant?

Exh E

8.      Whether anyone on the panel has had a member of their immediate family injured in an accident, a description of the accident, whether any litigation followed such accident, and whether the family member was a plaintiff or defendant?

9.      Whether any member of the panel or any other their immediate family members has ever suffered a neck, back, knee, shoulder or other injury as a result of an accident?

10.     Whether any member of the panel or any of their immediate family members have ever undergone arthroscopic surgery?  If so, when, and the nature of the surgery?

11.     Whether anyone has filed a lawsuit seeking damages for personal injuries to them or a family member?  (When, type case, injuries, result).

12.     Whether there is anyone on the panel who has any specific education, background or training in medicine, orthopaedics, or the investigation of accidents?

13.     Whether any member of the panel, or a member of their immediate family, has treated with Dr. Rodger H. Ostdahl of Harrisburg, Pennsylvania at any time?  If so, whether any panel members feels that that fact would cause them to give Dr. Ostdahl's testimony any more weight or any less weight than it would otherwise be entitled to?

14.     Whether any member of the panel, or member of their immediate family, has treated with Dr. Rodney K. Hough of Carlisle, Pennsylvania at any time?  If so, whether any panel member feels that that fact would cause them to give Dr. Hough's testimony any more weight or any less weight than it would otherwise be entitled to?

15.     Whether any member of the panel, or a member of their immediate family, has treated with Dr. John S. Rychak of Harrisburg, Pennsylvania at any time?  If so, whether any

panel member feels that that fact would cause them to give Dr. John S. Rychak's testimony any more weight or any less weight than it would otherwise be entitled to?

16.     Whether any member of the panel, or a member of their immediate family, has treated with Dr. Perry Eagle of York, Pennsylvania at any time?  If so, whether any panel member feels that that fact would cause them to give Dr. Eagle's testimony any more weight or any less weight than it would otherwise be entitled to?

17.     Whether anyone on the panel has previously served on a civil jury?  (When, type case).

18.     Do any of you have any physical or mental condition, which would affect your ability to serve on a jury?

19.     Do any of you have any religious or moral reasons or objections to sit as a juror in a civil case?

20.     Whether anyone on the panel feels, for any reason, that they could not listen to the evidence, apply the law as given to them by the Court, follow their oath as jurors, and render a fair and just verdict based solely on the evidence presented in the case?

Respectfully submitted,

GODFREY & COURTNEY, P.C.

By _____

E. Ralph Godfrey, Esquire
Attorney I.D. No. 77052
P.O. Box 6280
Harrisburg, PA 17112
(717) 540-3900
Attorneys for Defendants

Dated: 6-13-03

LIST OF EXHIBITS

CASE CAPTION:  Perkey v. Reliable Carriers, Inc. et al.

CASE NUMBER: 1:CV-00-1639

MIDDLE DISTRICT OF PENNSYLVANIA

JUDGE:  Magistrate Judge Smyser

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| 1 | | Police Report | | | | |
| 2 | | Maintenance Record for trailer | | | | |
| 3 | | Expert report of Dr. Perry Eagle & Videotape | | | | |
| 4 | | Expert report of Gabriel G. Alexander | | | | |
| 5 | | Expert report of Paul Anderson, D.Ed | | | | |
| 6 | | Photographs of Reliable Carrier's trailer | | | | |
| 7 | | Photographs of accident scene | | | | |
| 8 | | Accident Investigation Report | | | | |
| 9 | | Statement of Daniel Benben | | | | |
| 10 | | 12/8/80 Letter to Dr. Hough from Dr. Green | | | | |
| 11 | | Attending Physician Statement dated 8/23/82 | | | | |
| 12 | | Ford Life Insurance Co. Disability Statement | | | | |
| 13 | | Office Notes of Dr. Hough | | | | |
| 14 | | Letter of Dr. Ostdahl dated 5/3/1990 | | | | |

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| | 15 | Office note of Dr. Rychak 8/24/98 | | | | |
| | 16 | Office note of Dr. Rychak dated 1/19/98 | | | | |
| | 17 | Forum Health Record dated 9/15/98 | | | | |
| | 18 | Poole Therapy note dated 4/18/1996 | | | | |
| | 19 | Dr. Ostdahl letter dated 10/13/1998 | | | | |
| | 20 | Tristan Associates note dated 10/5/1998 | | | | |
| | 21 | Magnetic Imaging Center notes dated 10/7/98 | | | | |
| | 22 | Pennsylvania MRI Associates note dated 2/13/97 | | | | |
| | 23 | Magnetic Imaging Center note dated 7/30/1999 | | | | |
| | 24 | Health South Report dated 5/8/1997 | | | | |
| | 25 | Dr. Ostdahl note dated 10/28/99 | | | | |
| | 26 | Dr. Rychak note dated 10/7/2002 | | | | |
| | 27 | Magnetic Imaging Center note dated 6/13/2002 | | | | |
| | 28 | Emergency Room Department Supplement | | | | |

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| | 29 | Workermen's Compensation Pleadings | | | | |
| | 30 | Social Security Records | | | | |
| | 31 | Interrogatory Answers of John Perkey | | | | |

## SPECIAL VERDICT QUESTIONS

**Question No. 1**

Do you find that Reliable Carriers, Inc. and Daniel Joseph Bemben were negligent?

Yes _____        No _____

If you answer Question No. 1 "No", you should not answer any further questions.  Sign the verdict form and return to the courtroom.  If you answer Question No. 1 "Yes", proceed to Question No. 2.

**Question No. 2**

Was the negligence of Reliable Carriers, Inc. and Daniel Joseph Bemben a substantial factor in causing Plaintiffs' harm?

Yes _____        No _____

If you answer Question No. 2 "No", you should not answer any further questions.  Sign the verdict form and return to the courtroom.  If you answer Question No. 2 "Yes", proceed to Question No. 3.

**Question No. 3**

Do you find that Plaintiff John Perkey was negligent?

Yes _____        No _____

If you answer Question No. 3 "No", proceed to Question No. 5.  If you answer Question No. 3 "Yes", proceed to Question No. 4.

**Question No. 4**

Do you find that the negligence of Plaintiff John Perkey was a substantial factor in bringing about his harm?

Yes _____        No _____

Proceed to Question No. 5.

Exh 7

**Question No. 5**

Taking the combined negligence that was a substantial factor in bringing about Plaintiff's harm as 100 percent, what percentage of that casual negligence was attributable to Reliable Carriers, Inc. and Daniel Joseph Bemben and what percentage was attributable to Plaintiff?

Percentage of casual negligence attributable to Reliable Carriers, Inc. and Daniel Joseph Bemben:

_____%

Percentage of casual negligence attributable to John Perkey:

_____%

TOTAL          100      %

If you found Plaintiff John Perkey's casual negligence to be greater than 50%, sign the verdict form and return to the courtroom.  If you found Plaintiff John Perkey's casual negligence to be 50% or less, proceed to Question No. 6.


**Question No. 6**

State the amount of damages for the following categories, if any, sustained by Plaintiff John Perkey as a result of the accident, without regard to and without reduction by the percentage of casual negligence, if any:

Pain and suffering, inconvenience, loss of
life's pleasures, and embarrassment and
humiliation                                    $_____


Lost wages                                     $_____


Medical Expenses                               $_____


Proceed to Question No. 7.

**Question No. 7**

State the amount of damages, if any, sustained by Plaintiff Teresa Perkey, for loss of consortium:

$_____

_____

**(Foreperson)**

## CERTIFICATION OF SERVICE

**AND NOW**, this ___13___ day of ___June_____, 2003, I, E. Ralph Godfrey,

Esquire, Godfrey & Courtney, P.C., attorney for Defendants, hereby certify that I served a copy

of the within Pre-Trial Memorandum this day by depositing the same in the United States mail,

postage prepaid, at Harrisburg, Pennsylvania, addressed to:

    Marcus A. McKnight, III, Esquire
    Irwin, McKnight & Hughes
    West Pomfret Professional Building
    60 West Pomfret Street
    Carlisle, PA 17013

                E. Ralph Godfrey, Esquire